## STATE v. MUNGEON.

The privilege of a witness to refuse to give evidence criminating himself belongs to the witness, and is not a right of the party against whom he is called to testify, so that objection having been made only by the party, he may not complain that it was overruled.

Under Rev. Code Cr. Proc. § 364, requiring, as corroboration of an accomplice, such other evidence as tends to connect defendant with commission of the offense, testimony, on a prosecution for incest by defendant with his daughter, as to the manner in which the family lived, the opportunities for commission of the crime, the payment of money by defendant for sending away the child born to the daughter, and his silence when, in his presence, the daughter stated to another that he was the father of the child, is sufficient corroboration.

(Opinion filed, August 1, 1906.)

Error to Circuit Court, Grant County. Hon. J. H. McCoy, Judge.

Alex Mungeon was convicted of incest, and brings error. Affirmed.

*George S. Rix,* for plaintiff in error. *L. H. Bentley, State's Atty., Philo Hall, Atty. Gen.,* and *Aubrey Lawrence, Asst. Atty. Gen.,* for the State.

FULLER, P. J. Of the crime of incest, committed upon the person of his own daughter, plaintiff in error was found guilty as charged in the information and adjudged to serve a term of seven years in the Penitentiary at Sioux Falls. The inference is fairly sustained by the record that after the preliminary examination and before the trial a scheme was devised by certain members of the family to prevent the state from proving its case and leading questions propounded by leave of court to the witness, Theresa Mungeon, one of the daughters of the accused called on behalf of the prosecution, resulted as follows: "Q. Now, Theresa, didn't you make the statement, at the time your father was arrested, that your father had been in the bedroom several times out at your home on the farm with Amelia? A. Yes, sir. Q. Then you have seen your father and Amelia going in and coming out of the bedroom together, at home on the farm, have you not, a good many times? A. No, sir. Q. You made the statement, at the time your father was arrested, that you have seen them, and seen your father come in the bedroom and pull Amelia out of bed and take her out in the other room? A. I said I saw him pull her out of bed, but I did not say he brought her out in the other room. Q. You say you saw him come in the bedroom and pull her out of bed? A. Yes, sir. Q. You made a statement at the time your father was arrested that your father not only slept with Amelia, but with all the girls out on the farm? A. Yes sir. Q. Didn't you make the statement at the time he was arrested that he had been sleeping with Amelia nearly all of the time, or a good many times? A. No sir. Q. Didn't you come to my office, here at Milbank, and state to me that you were willing to testify in court in this case, and that you made the statement that your father was the father of Amelia's child? A. No, sir. Q. Didn't you also state to me a few days later that you had changed your mind and was not going to come into court and that Amelia had got into all this trouble, and that she could get you out? A. Yes, sir. Q. After you were put in jail here

as a witness, didn't you say to me that if I would let you out you would go to court and tell all you knew about it, and make the same statement to me that you made to Mr. Bouck at his office—didn't you say that? A. Yes, sir. Q. That, if I did not let you out, you would not—didn't you make that statement to me, too? A. Yes, sir." It also appears that during the trial, and while the complainant, Amelia Mungeon, was on the witness stand, the accused resorted to certain signs or manifestations to influence her testimony in his behalf, and, without claiming her personal privilege as an accomplice, she at first refused to answer all questions tending to establish the guilt of her father. The following discloses the trend of the examination and her sole reason for refusing to answer: "Q. Now, Amelia, you are the complaining witness in this case. I will ask you to state to the court and jury if on or about the 14th day of June you had sexual intercourse with your father, in 1904. (Witness does not answer.) By the Court: The court will protect you; nobody will harm you. Q. You did, didn't you? A. I said I would drop the case and would not say anything on either side, and I refuse to answer the question. By the Court: You will have to answer the question truthfully, and have to tell the truth. That is all you are required to do, which is to truthfully answer the question that this gentleman asks you, and, of course, you cannot drop the case. A. I have dropped it, and will drop it. * * * By a Juror: If the court please, I notice the prisoner at the bar making signs to the witness every time she has been asked that question." After repeated and strenuous efforts to induce the witness to testify, accompanied with assurance on the part of the court that she need not hesitate on the ground of fear from any source, a recess was taken, and upon convening in the afternoon counsel for the defendant objected to any further examination of the witness, and requested the court to advise her of the right to refuse to answer all criminating questions. The action of the court in overruling this objection and in declining to inform the witness as requested is urged as reversible error.

Whenever the testimony sought to be elicited may tend to subject a witness to criminal liability, he has the constitutional right to refuse to answer upon that ground, and, though the priv-

ilege is purely personal, it may well be suggested to the witness by the court whenever the demands of public justice require the exercise of such discretion. As the privilege of refusing to answer any incriminating question is thus personal to the witness, it appears to be well settled that he alone can claim it. In Commonwealth v. Shaw, 4 Cush. (Mass.) 594, 50 Am. Dec. 813, the headnote, fully sustained by the opinion, is as follows: "It is the privilege of a witness, and not the right of the party against whom he is called, to object to his giving evidence to criminate himself; and it is not the duty of the judge, upon the interposition of such party, and independent of any objection of the witness, to inform the latter of the rule of law that he is not bound to criminate himself." Lothrop v. Roberts, 16 Colo. 250, 27 Pac. 698; Commonwealth v. Gould, 158 Mass. 499, 33 N. E. 656; State v. Morgan, 133 N. C. 743, 45 S. E. 1033; Brown v. State, 20 S. W. 924; Ward v. People, 6 Hill 144; State v. Van Winkle, 80 Iowa 15, 45 N. W. 388; Morgan v. Halberstadt, 60 Fed. 592, 9 C. C. A. 147; State v. Wentworth, 20 Am. Rep. 688; State v. Foster, 55 Am. Dec. 191; White v. State, 52 Miss. 216; Ingalls v. State, 48 Wis. 647, 4 N. W. 785; San Antonio St. Ry. Co., v. Muth, 27 S. W. 752. Clearly the reasons stated by complainant for refusing to answer exclude the idea that she desired to claim any personal immunity, and the fact that she freely went into all the abhorrent details of the crime, after opposing counsel had suggested her right in open court and in her presence, leads to the irresistible conclusion that her former reluctance was due to a preconceived determination to defeat the ends of justice by preventing the conviction of her father. The ruling complained of is clearly within judicial discretion, and under the circumstances it was not erroneous for the court to insist upon answers to the questions propounded to the prosecuting witness.

While her testimony is confessedly explicit as to all the facts and circumstances of the crime, and shows on the part of the father a most culpable course of conduct toward his daughter, counsel for the defense urges a reversal on the ground that she is not corroborated by such other evidence as tends to connect the accused with the commission of the offense. Mr. H. S. Volkmar,

chairman of the local advisory board of the Children's Home, testified that the accused and Amelia, the prosecuting witness, called at his office during the month of August, 1904, a short time after the child was born, and requested him to make provision for sending it to the Children's Home at Sioux Falls, and at that time, while the three were present, Amelia told Mr. Volkmar that the accused was the father of her child. Arrangements were completed for th admission of the child to the home, and the accused gave Mr. Volkmar $25 to pay the expense of caring for the child until it became a little older and would require less attention. It will be noticed that the witness, Theresa Mungeon, though exceedingly hostile to the cause of the state, testified that she had seen her father pull Amelia out of bed, and this fact, when considered together with other circumstances in evidence, is certainly corroborative in character. The degree of corroboration applicable to this case is fixed by statute as follows: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant· with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense, or the circumstances thereof." Rev. Code Cr. Proc. § 364. In the case of State v. Hicks, 6 S. D. 325, 60 N. W. 66 it is said: "It is not necessary, as argued by plaintiffs in error, that the corroborative evidence of itself should be sufficient to prove the commission of the crime, or establish the defendant's guilt. To require that would be to render the evidence of the accomplice unnecessary and redundant. To corroborate means to strengthen; in this case, to make stronger the probative criminating force of the accomplice's testimony. His testimony alone is not self-supporting. It must be corroborated. Its credibility must be strengthened. The requirement of the statute is, not that such corroborating testimony shall prove or establish the defendant's connection with the commission of the crime, but that it shall so "tend." The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice."

The manner in which the family lived, the opportunities for the commission of the crime, the payment of the money by the accused for the purpose of sending the child away, and his silence when complainant stated to Mr. Volkmar in his presence that he was the father of the child, was competent as tending to connect the accused with the commission of the offense and its sufficiency was a question for the jury. Concerning such acquiescence by silence when the accused is free to speak, Prof. Greenleaf says: "Confessions, too, like admissions, may be inferred from the conduct of the prisoner and from his silent acquiescence in the statements of others respecting himself and made in his presence, provided they were not made under circumstances which prevented him from replying to them. The degree of credit due to them is to be estimated by the jury under the circumstances in each case." 1 Greenleaf on Evidence, § 215. The proposition that an admission of guilt may be inferred from the fact that the accused not under restraint, remained silent when the statement that he committed the offense is made in his presence, seems reasonable and is well supported by authority. Musfelt v. State, 64 Neb. 445, 90 N. W. 237; Commonwealth v. Brailey, 134 Mass. 527; Low v. State, 108 Tenn. 127, 65 S. W. 401; State v. Magoon, 68 Vt. 289, 35 Atl. 310; People v. Wennerholm, 166 N. Y. 567, 60 N. E. 259; People v. Amaya, 134 Cal. 531, 66 Pac. 794; White v. State, 153 Ind. 689, 54 N. E. 763; Heard v. State, 59 Miss. 545; Mitchell v. State, 62 S. W. 572; 3 Encyc. of Evidence, 299.

The accused, testifying in his own behalf, made no attempt to explain any of the significant circumstances disclosed by the record, or to excuse his silence at the time when the prosecuting witness made the statement that he was the father of her child. Therefore, such statement stands as a tacit admission on his part, which, with the other facts and circumstances, sufficiently corroborates the correct and positive testimony of Amelia.

Finding no reversible error in the record, the judgment of conviction is affirmed.