## J. FRANK MORRIS, Appellant, v. JOSEPH SAILER, Respondent.

### Kansas City Court of Appeals, January 30, 1911.

1. **LIBEL: Petition: Demurrer.** If a petition charges matter which does not constitute libel as a matter of law, it is proper procedure for the trial court to so declare on a demurrer by the defendant.

2. ———: **Editor: Candidate.** It is libelous to publish of an editor of a newspaper, who is a candidate for alderman, that "an editor who barters his space and advocates an unrighteous cause, will sell his influence at the first opportunity."

3. ———: **Question for Court.** Whether the matter charged is libelous is for the court only in cases where the language charged is incapable of being defamatory.

4. ———: ———: **Ambiguous: Two Meanings.** If the words charged as libel are subject to two meanings, one libelous and

154 App—20

the other not, it is for the jury to say whether they were used in the sense charged by the plaintiff, however improbable it may appear that they were used in that sense.

5. ——: ——: **Intention: Consequences.** The lack of an intention to libel will not excuse the defendant, since a sane man is presumed to intend the natural consequences of his act, whether it be a publication or other act.

6. ——: ——: ——: **Privilege: Candidate.** The publisher of a newspaper is not protected in defaming the character of a candidate for office. While it is his duty to discuss the merits of a candidate, he must not publish falsehoods of a libelous character. A candidate no more surrenders his private character to the public than he does his private property.

7. ——: ——: ——: **Evasion: Covert Meaning.** Ingenuity in the construction of language or dexterity of style will not protect one, if the words published will convey to the understanding of an ordinarily intelligent reader a defamatory charge.

Appeal from Cole Circuit Court.—*Hon. W. H. Martin,* Judge.

REVERSED AND REMANDED.

*Silver & Dumm* for appellant.

(1) It is sufficient to make a written publication libelous and actionable *per se* that it is false and tends to expose one to public hatred, contempt and ridicule, or to blacken his reputation. Nelson v. Musgrave, 10 Mo. 648; Price v. Whitely, 50 Mo. 439; McGinnis v. Geo. Knapp & Co., 109 Mo. 131; Ukman v. Daily Record, 189 Mo. 378; Manget v. O'Neill, 51 Mo. App. 26. (2) A newspaper is responsible for what it publishes the same as an individual. Johnson v. Post-Dispatch Co., 65 Mo. 539; Arnold v. Star-Sayings Co., 76 Mo. App. 159; State, etc., v. Sheppard, 177 Mo. 244. (3) An article libelous *per se* is presumed to be false and published without sufficient excuse until the contrary is shown. Russell v. Anthony, 21 Kan. 451; Holmes v

Morris v. Sailer.

Clisby, 121 Ga. 241; McIntyre v. Bransford, 17 S. W.
Rep. 359. (4) When the publication is libelous *per se,*
its falsity and defendant's malice are presumed. Brown
v. Knapp, 213 Mo. 655; Thomas v. Bowen, 29 Ore. 258;
Sander v. Jones, 13 N. D. 535; Morse v. Printing Co.,
124 Iowa 707.

*Irwin & Calfee* for respondent.

(1) While it is true that in case of a prosecution
for libel the jury are the judges of both the law and
the fact, it has never been understood that it was their
duty or their province to pass upon the pleadings in
the case. Military Academy v. Gaiser, 125 Mo. 527.
(2) But nowhere is it intimated in the opinion of
this court that the case ought to have gone to the jury
upon the question as to whether or not the petition
stated a good cause of action. If this contention is cor-
rect the judge of the court is but a mere figurehead,
a useless and unnecessary ornament in the trial of such
cases. We are unable to give our assent to this con-
tention. Military Academy v. Gaiser, 125 Mo. 527; Mc-
Ginnis v. Knapp, 109 Mo. 131. (3) "Whether the
alleged libelous words are capable of the construction
contended for (by the innuendo), is a question of law
for the court." Richardson v. Thorpe, 73 N. H. 532;
18 Am. and Eng. Ency. Law (2 Ed.), f. p. 994;
Gaither v. Advertising Co., 102 Ala. 458. It is for
the court to decide whether the publication is capable
of the meaning ascribed to it by the innuendo, and for
the jury to decide whether such meaning is truly
ascribed. 2 Greenleaf's Ev. (16 Ed.), sec. 417, note 2;
Townsend on Libel and Slander, sec. 284. "The cor-
rect rule in construing words seems to be that they
are to be taken not in *mitiori sensus,* but in their fair
English meaning. That if the meaning is fairly am-

biguous and one allowable meaning is libelous, the case may go to the jury. If, however, the meaning is unambiguous and will not reasonably admit of a libelous construction, the question is for the court." .Ukman v. Daily Record Co., 189 Mo. 394; Branch v. Knapp & Co., 222 Mo. 586. (4) "It is the duty of the court to refuse to allow a witness, in the trial of the cause, to testify as to his understanding of the article, for the reason that the article published must speak for itself." Branch v. Knapp & Co., 222 Mo. 580. "The court held the article to be plain and unambiguous and was, therefore, bound to declare its meaning as a matter of law." Branch v. Knapp & Co., 222 Mo. 580; Heller v. Pulitzer Pub. Co., 153 Mo. 205; Ukman v. Daily Record Co., 189 Mo. 378; Massey v. Tingle, 29 Mo. 437; Harrison v. Hance, 37 Mo. 185.

ELLISON, J.—Plaintiff instituted this action by filing a petition charging defendant with libeling him. The latter demurred to the petition on the ground that it did not state a cause of action. The demurrer was sustained by the trial court and plaintiff, refusing to plead further, judgment was rendered against him and he thereupon appealed.

The petition alleges that on the 4th of April, 1910, defendant was publisher of a newspaper in Jefferson City, called the "Daily Post;" and on that day, plaintiff was a candidate for the office of city councilman for that city, from the First ward therein. That late on the evening of the day preceding the election defendant wrongfully, wickedly and maliciously printed and published of and concerning plaintiff, the following false, libelous and defamatory words:

## "ELECT KAULLEN IN THE FIRST.

His Opponent Openly Espoused Cause of Higher Tele-
phone Rates—Only Safe Way for Citizens
of First Ward to Meet Issue is to
Vote for Peter Kaullen.

The people of the First ward will remember that
one of the candidates for alderman in that ward,
Frank Morris, was formerly editor of the *Tribune,*
and openly espoused the cause of higher telephone
rates through the medium of his paper. Up to the
time he went out of business he was heartily advocat-
ing an increase in telephone rates. Is he a safe man
to clothe with the power to increase rates and fasten
the unjust burden upon the people? If he advocated
it through the medium of his paper would he not vote
for it if in the council? He cannot escape by saying
he merely sold space, for an editor who barters his
space and advocates an unrighteous cause will sell his
influence at the first opportunity, therefore we infer
that he advocated the increase because he believed in
it, and believing in it we have the right to assume he
would vote for such an ordinance had he the oppor-
tunity.

There is but one safe way for the people to meet
the issue, and that is by electing Peter Kaullen, whom
the people know they can safely trust."

It is then charged that after printing such matter
in his paper, defendant caused one thousand copies
of the paper to be distributed and sold in Jefferson
City to the public generally.

While in actions for libel, the jury, under the di-
rection of the court, are to determine both the law and
the fact, yet, if the matters charged as libel are incapa-
ble of constituting that offense, it is the province of

the court to so declare; and a demurrer is a proper procedure to bring up the question. [Diener v. Star-Chronicle Pub. Co., 132 S. W. 1143; Branch v. Knapp & Co., 222 Mo. 580, 596; Ukman v. Daily Record, 189 Mo. 378; Heller v. Pulitzer Pub. Co., 153 Mo. 205, 214.]

But if the words are subject to two meanings, one libelous and the other not, it is for the jury to say whether they were used in the sense charged by the plaintiff. [Richardson v. Thorpe, 73 N. H. 532; Sanderson v. Caldwell, 45 N. Y. 398; Gaither v. Advertiser Co., 102 Ala. 458; Sharpe v. Larson, 67 Minn. 428.] "The mere capability of the libelous meaning is all that the court need pass on. Whether such meaning was, in fact, conveyed to the readers, is a jury question." [Scofield v. Milwaukee Free Press, 126 Wis. 81.] If the words are capable of a libelous meaning, "however improbable it may appear, the jury should say whether they may be so understood." [Morrison v. Smith, 177 N. Y. 366.]

In the light of the law, what ought a court to say of the words published by defendant? The publication stated that plaintiff had been an editor of a paper and through his paper had advocated an increase in telephone rates. That he could not escape responsibility for that by saying he merely sold space in his paper, "for an editor who barters his space and advocates an unrighteous cause will sell his influence at the first opportunity." Keeping within the bounds of reason, can any one say that such language is *incapable* of a libelous meaning,—is *incapable* of interpretation, by the readers of the paper,—that plaintiff's influence, as a city councilman, would be for sale? It seems to us it would be fairer to assert that such words, in the circumstances in which they were published, come nearer being incapable of an innocent meaning than a libelous one. There is enough in the words ac-

companying those just quoted to prevent our saying they are libelous, as a matter of law, but we do say, that giving defendant the benefit of an interpretation influenced by the entire publication, they have a stronger tendency to show defendant to be guilty of libel than innocent of it.

But, conceding that defendant really did not intend to charge libelous matter, that would not excuse him. "Want of actual intent to villify is no excuse." [Hallam v. Post Pub. Co., 55 Fed. Rep. 456.] For, "a sane man is presumed to intend the natural and necessary consequences of his act, whether that act be a publication or any other act." [Wynne v. Parsons, 57 Conn. 73; 18 Am. and Eng. Ency. Law (2 Ed.), 994.] The question is, in what sense the readers understood it. [Caruth v. Richeson, 96 Mo. 186, 190.] The words must be understood by the court in the same sense the rest of mankind would understand them. [McGinnis v. Knapp & Co., 109 Mo. 131, 140, 141.] An innocent intention will not overcome an accomplished wrong.

Nor is there anything to uphold the ruling of the trial court in the suggestion that plaintiff, being a candidate for public office, and defendant a publisher of a newspaper, it was his privilege, in duty to the public, to make the publication; and though subject to defamatory interpretation, it was necessary that the publication be made for the information of the general public and thereby become a matter of discussion by the electors, who would be assisted in making up their minds as to plaintiff's fitness for the position he was seeking.

Undoubtedly the public press have a grave duty to perform for the public, the value of which cannot be measured. It is capable of the greatest good and at the same time the greatest evil, of any single influence on our civilization. It is the duty of the courts to pro-

mote the former by every just consideration for the welfare of the public, and to restrain the latter by certain punishment for every malicious overstepping of the privilege of free and fair discussion of a public character. The press has the high privilege of discussion of the merits of a candidate and of his fitness for the office he seeks; but it must keep within the bounds of truth. There is no privilege in falsehood. Our Supreme Court, in Smith v. Burrus, 106 Mo. 94, decided that defamation of a candidate for office was not privileged, even though made in good faith, and quoted with approval the following from Rearick v. Wilcox, 81 Ill. 77: "While the qualification and fitness of a candidate for office might properly be discussed with freedom by the press of the country, we are aware of no case that goes so far as to hold that the private character of a person who is a candidate for office can be destroyed by the publication of a libelous article in a newspaper, notwithstanding the election may be attended with that excitement and feeling that not unfrequently enters into our elections. . . . The law required appellee, as the publisher of a journal, to publish facts, and not libelous articles. The character and reputation of appellant was as sacred, and as much entitled to protection, when a candidate for office, as at any other time."

The Supreme Court of Ohio said, in reference to the same subject, that:

"In our opinion a person who enters a public office or becomes a candidate for one, no more surrenders to the public his private character than he does his private property. Remedy by due course of law for injury to each is secured by the same constitutional guaranty, and the one is no less inviolable than the other. To hold otherwise would, in our judgment, drive reputable men from public positions and fill their places with others having no regard for their reputa-

tion, and thus defeat the purpose of the rule contended for, and overturn the reason upon which it is sought to sustain it.'' [Publishing Co. v. Maloney, 50 Ohio St. 71.]

It will be noticed that the words following, and in the same sentence with, the statement that an editor ''will sell his influence at the first opportunity,'' is the further statement, by way of a conclusion from what has gone before, that therefore it is inferred he advocated an increase in telephone rates because he believed in it and that if he believes in it he will vote for an ordinance to that effect if elected. From this, it is argued that honest motives were ascribed to plaintiff which repel any suggestion of defamation in other parts of the publication. Those words, said to give a meaning to the others, do not so far control the entire charge as to render it, as a whole, incapable of libel. The most that can be said is that they make the meaning ambiguous and thereby make a case for the jury as one of fact and not for the court as one of law. If artfulness in expression were to be a road of escape, the defamer would go free in a large proportion of instances. ''The law cannot be evaded by any of the artful and disguised modes in which men attempt to conceal libelous or slanderous meanings.'' [McGinnis v. Knapp & Co., 109 Mo. 131, 141.] In State v. Norton, 89 Me. 290, it was said that ''The libeler cannot defame and escape the consequences by any dexterity in style.'' And that ''It is not the ingenuously possible' construction, but the plainly normal construction, which determines the question of libel or no libel in written words which are maliciously published.''

It follows that for error in sustaining defendant's demurrer, the judgment will be reversed and the cause remanded. All concur.